UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DOCMAGIC, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:09CV1779MLM |
| ) | |
| THE MORTGAGE PARTNERSHIP OF ) | |
| AMERICA, L.L.C., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Before the court is the Motion for Summary Judgment on Count I of Defendant's Counterclaim and Motion for Summary Judgment on All Counts Within Plaintiff's First Amended Complaint filed by The Mortgage Partnership of America, L.L.C. (referred to herein as "Lenders One"). Doc. 59. DocMagic filed a Response. Doc. 66. Lender's One Filed a Reply. Doc. 68. DocMagic filed a Sur-Reply. Doc. 72. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 11.

**STANDARD FOR SUMMARY JUDGMENT**

The court may grant a motion for summary judgment if "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn. & E.R.R. Co.,

327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of Lender One's Motion.

## FACTUAL BACKGROUND[1] and DISCUSSION

The parties entered into a written contract on October 31, 2008, which states, among other things, that Lenders One provides "mortgage products and services, related products and services on a cooperative basis to the Members" of a cooperative alliance of "certain mortgage loan originators"; that DocMagic is a "provider of mortgage loan document preparation software used in the

---

[1] The facts are undisputed unless otherwise stated. While the parties technically complied with the Federal and Local Rules regarding summary judgment, the parties did not specifically respond, in an orderly fashion, to each of the opposing party's undisputed facts. As such, it is impossible for the court to decipher whether numerous factual allegations are disputed.

2

preparation of, among other things, pre-disclosures and closing documents ('Products and Services')"; that DocMagic desired "to provide the Products and Services to the Members" of the cooperative alliance and "desire[d] to engage the services of [Lenders One] ... for the sole purpose of assisting [DocMagic] in marketing and selling its Products and Services to the Members"; and that Lenders One desired to assist DocMagic in doing so. Doc. 20-2 at 1. The contract is for a three year period commencing November 1, 2008, and terminating October 31, 2011. Doc. 20-2, ¶1. Pursuant to the contract, Lenders One was to supply DocMagic "with a list of all current Members," "refer, market and promote the Products and Services to Members," and "encourage Members to purchase and use the Products and Services from DocMagic." Doc. 20-2, ¶ 2.

The contract further provides that Lenders One was, "in its sole discretion, [to] determine its own marketing strategy; provided, however, that [DocMagic] [would] have the right to review and approve (which review and approval will not be unreasonably withheld, delayed, or conditioned) the content of any marketing piece that reference[d] [DocMagic's] Products and Services." Doc. 20-2, ¶ 2. The contract provided that DocMagic would discount certain Products and Services which were sold to members during the term of the contract. The specific discounted price for these Products and Services was set forth in the contract. Doc. 20-2, ¶ 4. The Contract states that DocMagic "shall participate in not more than two (2) Lenders One membership conferences per year" and that for each conference which DocMagic attended it would pay Lenders One a $2,000 sponsorship fee. Doc. 20-2, ¶ 6.

"In consideration of Lenders One's Marketing Efforts and other services provided to and for the benefit of DocMagic," the contract provides that DocMagic is to "pay Lenders One ten percent (10%) of all DocMagic's revenue received from the purchase of" DocMagic's mortgage loan closing packages and pre-closure packages "only by the Members during the Term (the 'Marketing Fee')."

3

Doc. 20-2, ¶ 5. Prior to entering into the parties' contract, DocMagic had established business relationships with, and had previously provided Products and Services to some Members, although the exact number of such Members is disputed. Doc. 20, ¶ 14; Doc. 40, ¶ 14.

Lenders One hosts Members' conferences twice each year. In March 2009, it held one conference in San Diego, California, which DocMagic attended. It also held a conference in August 2009, in Washington , D.C. Lenders One informed DocMagic in June 2009 that it would not be allowed to attend the August 2009 conference unless it cured its alleged default.

An e-mail, dated March 25, 2009, to DocMagic from Luke A. Pille, Director of National Programs for Lenders One, states Mr. Pille "would like to recommend [a] weekly or biweekly call between L1 and DocMagic to review items" including "upcoming new member visits," "Lenders One prospects," and "Symposiums with prospects." Mr. Pille further stated that he was "optimistic because [Lenders One] ha[d] 85 members who [were] not using DM today. ... I think we have gotten thru to the current customers who were looking for a price reduction on existing volume to you guys. Now, we may see a few more as we add members, but we should [b]e well positioned to get you NEW business." Pl. Ex. 9. Mr. Pille testified that he did not implement weekly or bi-weekly telephone conferences and that Lenders One did not initiate mail or e-mail campaigns on behalf of DocMagic. Pl. Ex. 1 at 135. He also testified that Lenders One did the following to promote DocMagic's Products: it sent out an e-mail announcement, issued a press release, placed a blurb on Lenders One's website, included DocMagic on Lender One's PowerPoint presentations, advised Lenders One regional managers that DocMagic was a vendor, and conducted random Member reviews. Pl. Ex. 1 at 84-86.

An e-mail, dated May 15, 2009, from Mr. Pille to Steve Ribultan of DocMagic states that the contract executed by the parties required DocMagic to provide Lenders One "with monthly reporting

4

and revenue sharing" and that "[s]ince the inception of the agreement, [Lenders One] ha[d] only received one report and one check." Def. Ex. V. Don Iannitti, DocMagic's president, testified that DocMagic inadvertently paid Lenders One a marketing fee for orders placed by Pre-Existing Customers due to an accounting error. Pl. Ex. 3 at 16.

An e-mail, dated May 20, 2009, from Mr. Pille to Mr. Ribultan states that Mr. Pille reviewed the reports that Mr. Ribultan sent and "they [were] not accurate" as they "look[ed] to show new business. Our agreement pays Lenders One a commission on all member volume." Def. Ex. W. Mr. Pille noted that DocMagic's November and December 2008 reports were "correct" and he asked that Mr. Ribultan provide a "corrected report ASAP." Def. Ex. W.

A letter titled "Notice of Default," dated June 15, 2009, to DocMagic from Lenders One's attorney states, among other things, that DocMagic had "failed to timely perform as required by the contract." Def. Ex. R. Specifically, this letter states that DocMagic "failed to provide monthly reports of *all* products and services purchased by Members during the term" and that it "failed to pay the required Marketing Fee for *all* products purchased by its Members." Def. Ex. R (emphasis in original). Additionally, the letter states that "perhaps DocMagic ha[d] misinterpreted the contract to apply only to new customers" and that "DocMagic's interpretation is contrary to the clear, unequivocal language of the contract and contrary to its performance in 2008." Def. Ex. R.

An e-mail, dated July 27, 2009, from Mr. Pille to Mr. Ribultan states that Mr. Pille "really need[ed] to know what [DocMagic's] plans [were] regarding the current agreement." Pl. Ex. 14. Mr. Pille further stated that he "really d[i]dn't think we can have you at our conference unless you cure with us." Pl. Ex. 14.

An e-mail, dated July 30, 2009, from Mr. Pille to Mr. Iannitti regarding the "Upcoming Lenders One Conference," states that "the status quo, under which DocMagic is in default of its

5

obligations to Lenders One cannot continue.  It is incumbent on you and your team to help us solve this problem and with the conference looming, it hastens the need to do so." Def. Ex. 16.

Alan Brisbane, DocMagic's Director of Operations, testified that DocMagic's agreement to reduce the amount of revenue it would have otherwise generated from the sale of its Products to Pre-Existing Customers was predicated upon its belief that those losses would be offset by new business received. Pl. Ex. 2 at 34, 36.  Mr. Brisbane also testified that prior to the contract going into effect, "between 15 and 20" Lenders One Members were existing customers of DocMagic. Pl. Ex. 2 at 14. Mr. Ribultan testified that Mr. Pille told him that Lenders One regional representatives would "be constantly in the offices of their different partners and that they would be constantly pitching the different vendors that [were] partners with Lenders One to the different lenders.  And so we would start seeing a lot of e-mails and asking us to get in touch with a lot of different banks at that point. And that just didn't happen." Pl. Ex. 4 at 29-30.  Mr. Robultan also testified that Mr. Pille told him that Lender One's Members closed "several thousands" of transactions each month and that DocMagic "would see the majority of [Members] buying [its] products." Pl. Ex. 4 at 7-8, 100.

DocMagic alleges, as follows, in Count I of the Amended Complaint, Breach of Contract: although DocMagic fulfilled its obligations under the Contract, Lenders One did not undertake any effort to market or promote DocMagic's Products and Services to New Customers other than initially announcing its partnership with DocMagic via "an e-mail blast and a written press release"; Lenders One charged and demanded a marketing fee from DocMagic despite not having undertaken its contractual obligation to market DocMagic's Products and Services; Lenders One refused to grant

6

DocMagic admission to Lender One's July 2009 membership conference; Lenders One, therefore, breached the Contract; and DocMagic incurred damages a result.[2]

DocMagic further alleges, in Count II, Breach of Duty of Good Faith and Fair Dealing in that Lenders One breached the contract's implied covenant of good faith and fair dealing.[3] In Count III, DocMagic seeks Rescission based on Lenders One's allegedly breaching its obligation to market and promote DocMagic's Products and Services to new customers.[4] In Count IV, DocMagic seeks Declaratory Judgment that Lenders One is not entitled to a marketing fee with respect to sales and services provided to Pre-Existing Customers. In Count V, DocMagic alleges Unjust Enrichment in that it mistakenly paid Lenders One for Products and Services ordered by Pre-Existing Customers.[5]

---

[2] To establish breach of contract, Missouri law provides a party must establish: the existence of an enforceable contract, mutual obligation arising under the terms of the contract, failure to perform on the part of the other party, and resulting damages. Rice v. West End Motors, Co., 905 S.W.2d 541 (E.D. Mo. 1995).

[3] "'Missouri law implies a covenant of good faith and fair dealing in every contract.'" Missouri Consol. Health Care Plan v. Comm. Health Plan, 81 S.W.3d 34, 45 (Mo. Ct. App. 2002) (quoting Farmers' Elec. Coop., Inc. v. Missouri Dep't of Corr., 977 S.W.2d 266, 271 (Mo. 1998) (en banc)). This "duty prevents one party to [a] contract to exercise a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." Id. at 45 n.3 (citing 1A Corbin on Contracts § 165 (1963); Summers, The General Duty of Good Faith Its Recognition and Conceptualization, 67 Cornell L.Rev. 810, 821 et seq. (1982)). The duty of good faith and fair dealing, however, "will not be inserted into [a] contract where the parties expressly address[ed] the matter at issue in their agreement." Id. at 45.

[4] Missouri law permits rescission of a contract "within a reasonable time after discovery of the grounds for rescission." Stone v. Kies, 227 S.W.2d 85, 88 (Mo. Ct. App. 1950). "To justify a rescission, the breach 'must relate to a vital provision going to the very substance or root of the agreement, and cannot relate simply to a subordinate or incidental matter.'" Ballenger v. Castle Rock Bldg. Corp., 904 S.W.2d 62, 63 (Mo. Ct. App. 1995) (quoting B & B Equip. Co. v. Bowen, 581 S.W.2d 80, 85–86 (Mo. Ct. App.1979)).

[5] The Missouri appellate court held in S & J, Inc. v. McLoud & Co., 108 S.W.3d 765, 768 (Mo. Ct. App. 2003):

An unjust enrichment has occurred where a benefit was conferred upon a person in

In Count VI, DocMagic alleges Tortious Interference in that Lenders One intentionally and purposely interfered with DocMagic's business relationships and/or expectancies with Lender One's customers, including New Customers and Pre-Existing Customers, by among other things, not permitting DocMagic to attend the fall 2009 conference.[6]  In  Count VII, DocMagic alleges Fraud in the Inducement, in that Lenders One made certain material and false misrepresentations to DocMagic, that Lenders One knew the misrepresentations were false when made, that these misrepresentations were made for the purpose of deceiving DocMagic, that DocMagic was deceived and reasonably relied on these misrepresentations, and that DocMagic was damaged as a result.[7]

In its Counterclaims, Lenders One alleges, in Count I, Breach of Contract, based on Lender One's allegedly meeting its obligations under the Contract, including marketing DocMagic's Products and Services, and on DocMagic's allegedly failing to abide by its obligations by allegedly  failing to pay Lenders One ten percent of revenue received by DocMagic from the purchase of its Products and

---

circumstances in which retention of the benefit, without paying its reasonable value, would be unjust. Woods v. Hobson, 980 S.W.2d 614, 618 (Mo.App. S.D.1998). "The right to restitution for unjust enrichment presupposes: (1) that the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; (3) that it would be unjust to allow the defendant to retain the benefit." Petrie v. LeVan, 799 S.W.2d 632, 635 (Mo. App. W.D.1990). The most significant of the elements for a claim of unjust enrichment is the last element, which is the requirement that the enrichment of the defendant be unjust. Associate Engineering Co. v. Webbe, 795 S.W.2d 606, 608 (Mo. App. E.D.1990).

[6]   The Missouri Supreme Court held in Community Title Co. v. Roosevelt Federal Savings and Loan Association, 796 S.W.2d 369, 372 (Mo. 1990):

A claim for tortious interference with a contract or business expectancy requires proof of each of the following: (1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and, (5) damages resulting from defendant's conduct. Fischer, etc. v. Forrest T. Jones & Co., 586 S.W.2d 310, 315 (Mo. banc 1979).

[7]   This court has discussed the elements of Fraud in the Inducement in its Memorandum Opinion addressing Lender One's Motion to Dismiss Count VII. Doc. 33.

Services to Members. In Count II, Lenders One seeks Declaratory Judgment that DocMagic failed to pay Lenders One fees owed pursuant to the Contract, and in Count III, Lenders One alleges Unjust Enrichment. Doc. 40.

Mr. Brisbane testified that there was a difference between "purchases" and "orders," and that only new customers can purchase. Pl. Ex. 2 at 18. He further testified that a purchase is a "one time event" and that the subsequent use of a product is an "order placement." Pl. Ex. 2 at 18. Thus, DocMagic contends that the contract's requiring it to pay a marketing fee on "the purchase of Products and Services ... by the Members" does not include orders placed by Pre-Existing Customers. The term "purchase," however, as used in the contract, is not "reasonably open to different constructions" nor is it ambiguous. American Family Mut. Ins. v. Van Gerpen, 151 F.3d 886, 888 (8th Cir. 1998). Under such circumstances, the court must give "purchase" its plain and ordinary meaning. Id. at 887-88 ("Under Missouri law, we must give terms in a[] [] contract their plain meaning 'unless it plainly appears that a technical meaning was intended.'") (quoting Farmland Indus., Inc. v. Republic Ins. Co., 941 S.W.2d 505, 508 (Mo. 1997) (en banc)). See also Bailey v. Fed. Mut. Ins. Co., 152 S.W.3d 355, 357 (Mo. Ct. App. 2004) ("In considering the contract's language, we understand it according to the plain and ordinary meaning of the words used, or the meaning that a person of average intelligence, knowledge, and experience would deem reasonable.") (citing Farmland, 941 S.W.2d at 508). Courts properly consult Black's Law Dictionary for the plain and ordinary meaning of a term. Id. Black's Law Dictionary (9th ed. 2009), defines purchaser as "[o]ne who obtains property for money or other valuable consideration; a buyer." Further, the contract clearly defines "Members" as "mortgage loan originators which are members of a cooperative alliance ... managed by Lenders One." Moreover, the contract unambiguously provides that the ten percent marketing fee described above is applicable to Members' purchase of the Products and Services. Doc.

9

20-2, ¶ 5. This provision clearly and unambiguously does not exclude purchases by Members who were DocMagic's pre-existing customers. Additionally, the contract does not make a distinction between purchases and orders. As such, the court finds, as a matter of law, that the contract provides that DocMagic was required to pay a ten percent marketing fee for Products and Services purchased by Lender One's Members who were DocMagic's pre-existing customers. See American Family, 151 F.3d at 887-88; Bailey, 152 S.W.3d at 357.

On the other hand, the court finds that there are genuine issues of material fact in regard to all of DocMagic's claims and in regard to Count I of Lender One's Counterclaims, including but not limited to the number of Members who were DocMagic's Pre-Existing Customers, whether each of the parties fulfilled their obligations under the contract, whether and when either of the parties breached the contract,[8] the nature and extent of any breach, whether either of the parties was injured and the extent to which each was injured as a result of the other party's breach, whether any breach of the contract was material, and whether Lender One's refusal to permit DocMagic attend its fall 2009 conference was justified. The court finds, therefore, that the Motion for Summary Judgment on Count I of Defendant's Counterclaim and Motion for Summary Judgment on All Counts Within Plaintiff's First Amended Complaint should be denied.

Accordingly,

**IT IS HEREBY ORDERED**, that the Motion for Summary Judgment on Count I of Defendant's Counterclaim and Motion for Summary Judgment on All Counts Within Plaintiff's First Amended Complaint filed by Lenders One is **DENIED**, in part, and **GRANTED**, in part. Doc. 59

---

[8] Missouri law provides that "'[a] party to a contract cannot claim its benefits where he is the first to violate it.'" Forms Mfg., Inc. v. Edwards, 705 S.W.2d 67, 69 (Mo. Ct. App. 1985) (quoting S.G. Adams Printing v. Cent. Hardware Co., 572 S.W.2d 625, 629 (Mo. Ct. App.1978).

**IT IS FURTHER ORDERED** that, as a matter of law, the contract between DocMagic and Lenders One requires DocMagic to pay a ten percent marketing fee for Products and Services purchased by Lender One's Members who were DocMagic's Pre-Existing Customers and that, in all other respects the Motion for Summary Judgment on Count I of Defendant's Counterclaim and Motion for Summary Judgment on All Counts Within Plaintiff's First Amended Complaint filed by Lenders One is **DENIED**.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of June, 2011.